# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

GEORGE BEHR,

        Plaintiff,


v.                                   **MEMORANDUM OF LAW & ORDER**
                                        Civil File No. 06-3577 (MJD/AJB)

DAN FORTIER, in his official capacity
as Secretary-Treasurer of Metal Shop,
Warehouseman and Helpers Union
Local 970; SCOTT GELHAR, in his
official capacity as Recording Secretary
and Business Agent of Metal Shop,
Warehouseman and Helpers Union
Local 970; ANDREW TRUCHINSKI,
in his official capacity as President of
Metal Shop, Warehouseman and
Helpers Union Local 970; and METAL
SHOP, WAREHOUSEMAN AND
HELPERS UNION LOCAL 970;

        Defendants.
_____

Daniel J. Boivin, Meshbesher & Spence, Ltd., Counsel for Plaintiff.

Patrick John Kelly and Trevor S. Oliver, Kelly & Fawcett, PA, Counsel for
Defendants.

_____

1

## I.    INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary

Judgment.  [Docket No. 26]  The Court heard oral argument on February 22, 2008.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Parties

Plaintiff George Behr has been a member of Defendant Metal Shop,

Warehouseman and Helpers Union Local 970 ("Local 970") since 1979.  He was

elected as Vice-President of Local 970 in 1988 or 1989 and appointed as a

Business Agent of Local 970 in 1995.  As a Business Agent, Behr worked full time.

Defendant Dan Fortier is the Secretary-Treasurer of Local 970.  Fortier had

appointed Behr as a Business Agent.  Defendant Scott Gelhar is the Recording

Secretary and a Business Agent of Local 970.  Defendant Andrew Truchinski is

the President of Local 970.  Bruce Mehlhop and Roger Denbrook are Trustees of

Local 970.

Defendant Local 970 is a trade union chartered by the International

Brotherhood of Teamsters, AFL-CIO ("IBT").  It conducts its business under the

Local 970 bylaws and the IBT Constitution.

2

### 2.     Issues Related to Elections

In 2006, the IBT held an election for its national officers.  The primary offices are General President and General Secretary-Treasurer, and the candidates for these offices normally run as a ticket.  The incumbent slate for the 2006 election was headed by James P. Hoffa as candidate for General President and C. Thomas Keegel as candidate for General Secretary-Treasurer.  Local 970 was supporting the Hoffa/Keegel reelection campaign.  Behr believes that Keegel has a close friendship with Fortier, Gelhar, and Truchinski.

In August 2005, Gelhar asked Behr to donate $700 to the Hoffa/Keegel campaign, stating that the campaign wanted $700 from each of the officers and $400 from each of the trustees.  Behr did not want to support the Hoffa/Keegel ticket because he felt that they had mistreated a friend of his.  Behr told Gelhar that he declined to donate any money to the Hoffa/Keegel campaign at that time, and Gelhar told Fortier and Truchinski of his refusal.

According to Behr, in September 2005, Truchinski asked Behr for a contribution to the Hoffa/Keegel campaign, and Behr again refused and told Truchinski that he already knew why Behr was not supporting the campaign.  Behr then called Fortier and left a message telling Fortier that he was not

3

supporting the campaign.

Behr worried that he might lose his job, so, that night, he hand-delivered a contribution check to the Local 970 office.  He left another message with Fortier telling him that he had provided the check.  He also informed Truchinski of his contribution.

Fortier later returned Behr's personal check to him and said that he would pay the money himself.  Fortier then suggested that Behr resign from the Jurisdiction Committee: Keegel had appointed him to the Committee, which paid Behr $250 per month.  Fortier claims that he asked, "[H]ow can you work for a man that you don't support?  How can you serve on that committee and not support him? . . . Why don't you just resign from the committee?"  According to Behr, Fortier told him that there was a rule that Behr could not serve on the Jurisdiction Committee if he did not support the Hoffa/Keegel campaign, so he would have to resign.  Behr claims that he twice asked Fortier if there really was such a rule, and Fortier twice affirmed that there was.  Behr resigned from the Jurisdiction Committee.

Behr claims that he then asked Keegel about the Jurisdiction Committee rule, and Keegel stated that no such rule existed and that Behr could have his job

back on the Jurisdiction Committee.

In October or November of 2005, Behr did make his $700 contribution to the Hoffa/Keegel reelection campaign, but he delivered the check directly to the campaign office and not through Local 970. Fortier asserts that he was not aware of Behr's contribution. In December 2005, Behr was reinstated to his position on the Jurisdiction Committee.

Under the IBT's election rules, the election of delegates to the IBT Convention would take place by mail, at the expense of the local union, if there was a contest for a delegate spot. The delegates to the convention would then nominate candidates for the national offices.

Behr recounts that, in December 2005, Truchinski told Behr that he would not be on the planned slate to attend the convention because he did not support the Hoffa/Keegel ticket. Behr intended to have someone nominate him for election as a delegate. However, when the time came for nomination, Behr did not run for election because he did not have the votes to get elected and it would be expensive for Local 970.

In April 2006, Behr met with Keegel to discuss his concerns about improper election procedures for the IBT Convention of Delegates at Local 970 and

concerns that Local 970 was violating its election bylaws.  Behr avers that he

asked Keegel for the proper procedure for filing a grievance against Truchinski

and Fortier for retaliation, but Keegel did not supply this information to him.  In

May 2006, Keegel sent a letter to Behr stating that Local 970 carried out the

delegate selection process in conformity with the IBT election rules.

### 3.     Behr's Request for Financial Information

#### a.     Behr's Concerns

In 2001, Local 970 was facing financial stress as some shops closed and

membership declined.  Behr began to seek ways to reduce expenses and was

particularly concerned with the cost to Local 970 of leasing vehicles for officers'

use.

Behr was especially concerned about spending by Fortier.  He claims that,

in 2002, Trustees Melhop and Denbrook told Behr that they were concerned

about improper receipts submitted by Fortier.  Behr told them to speak to

Truchinski, who told them he would take care of it.  Behr examined the monthly

receipts and decided that Fortier's expenses were too high and, in early 2002,

complained to Keegel about Fortier's spending.

On December 5, 2005, Behr complained to Truchinski that Fortier was

spending too much money while having only four shops and that Fortier's credit card bill and phone bill were very high.

Defendants have provided evidence that the officers' credit cards are in their own names and Local 970 reimburses them only for those business expenses supported by receipts. Local 970 had not issued union credit cards since 1999, and instead required officers to use their own cards and apply for reimbursement. If an officer accrues interest on an unpaid credit card balance, Local 970 does not pay that interest. The receipts and disbursements, including credit card receipts, went before the Executive Board, which included Behr, each month.

Local 970 leases vehicles for its officers' use. In April 2006, Behr asked Teresa Connolly, Local 970's bookkeeper, for a summary of the total costs of leased vehicles, including his own, used by officers. After Behr requested the information, he found a summary of the cost of his own leased vehicle on his desk, but no information on the vehicles used by Fortier. Behr claims that Connolly told him that Fortier said that this was all the information Behr could have. According to Behr, Connolly did not tell him he had to make a personal request for the information to Fortier.

**b.      Behr's Access to Financial Records**

Connolly uses a computer program called QuickBooks.  All of the

information in the QuickBooks reports was available to Behr in the form of

individual receipts or credit card bills, but the QuickBook report, which combines

all of the charges and then allocates them to categories, such as meals or gas, is

only available by accessing QuickBooks, which only Connolly can do.

Behr had access to Local 970's paper receipts and other financial records.

The Board, including Behr, received copies of all receipts and invoices received

by Local 970, as well as copies of all checks written to pay for expenses.  The

collected items – receipts attached to Local 970 check stub – would be kept in a

file drawer.  Behr knew about this storage system, had access to it, and regularly

used it to review Local 970's financial records.

**4.      Termination of Behr's Employment**

**a.      June 2, 2006 Meeting**

According to Truchinski, in December 2005 or January 2006, Fortier told

him that he had finally decided to fire Behr.  Fortier asserts that he had first

thought of terminating Behr as Business Agent about two years before June 2006.

Fortier claims that he decided to terminate Behr because he had negotiated

8

bad contracts, failed to get along with members, staff and business agents, committed inappropriate and abrasive behavior, failed to communicate about key issues, and demonstrated a lack of understanding of union procedures – such as how delegates were chosen.

In May 2006, Truchinski told Behr that Fortier wanted to meet with Behr on Friday, June 2.  According to Behr, on May 24, he called Fortier to ask what the meeting was about, and Fortier assured him it was to discuss the bylaws and the leased vehicles used by the Local 970 officers.

Fortier, Truchinski, and Martin Costello, attorney for Teamsters Joint Council 32 and IBT, were all present at the June 2, 2006 meeting.  According to Behr, Fortier began the meeting by stating, "Brother George, this is the saddest day of my life, I have to fire you."  Fortier did not specify whether he was firing Behr as Business Agent or as Vice-President.  Behr avers that Fortier refused to tell Behr why he was being fired, although Behr asked.  Fortier had prepared a letter terminating Behr as Business Agent, which he left on the table and Behr handed back to him at the end of the meeting.

Sometime during the meeting Fortier, Costello, or Behr mentioned retirement as an option.  Behr admits that he was open to considering retiring as

9

Vice-President, depending on the written terms of the retirement package.

According to Behr, the meeting ended with handshakes and an arrangement to meet on Tuesday, June 6 to go over a written retirement proposal that Costello would prepare, as well as a mutual release.  Behr claims Costello recommended that Behr consult an attorney before accepting any proposal and told Behr that he would have a seven-day period after the June 6 meeting to accept or reject any proposal.  Behr asserts that he left the meeting thinking that he had not agreed to anything and that retirement was conditional on speaking to his wife and his approval of the written severance that Costello would prepare.

### b.    Behr's Decision to Not Retire

According to Behr, over the weekend he decided he did not want to retire at all.  He states that his personal attorney was out of town on June 6, so Behr called Costello's office on June 5 and left a message stating that he did not want to retire and that he would not attend the June 6 meeting.  Also on June 5, Behr's attorney faxed and mailed a letter to Costello stating that Behr had been improperly terminated and requesting the reason for his termination in writing.  The June 6 meeting did not occur.

10

Behr told member Randy Geisler that he would no longer be representing him, but could not talk about it because "[t]here's an issue with did I retire, didn't I retire and there's legal issues." (Behr Dep. 72.) Behr also told John Hummel and Brian Bosman that he was thinking about retiring but had not yet received any documentation from the attorney from the union side.

Behr did decide to return his leased vehicle; he claims he did this to save union money, not because he had decided to retire. In mid-June, he removed his personal equipment from the truck and returned the truck to the dealership. When the dealership asked why he was returning the truck, Behr told him, sarcastically, "Well, I guess I will be retiring." (Behr Aff. ¶ 33.)

On June 19, 2006, Fortier wrote a letter to Behr confirming Behr's retirement as Business Agent and Vice-President effective July 1, 2006. On June 21, Costello sent a memorandum to Behr's attorney stating Behr had not been terminated but had retired. Behr's attorney responded on June 30 stating that there was no agreement and Behr would be reporting back to work the next week.

Behr had surgery in June and attempted to return to work on July 5, 2006. He called Connolly and told her he was still employed and that she should

forward calls to his cell phone, but Connolly called and left a message that Fortier had told her Behr was retired.

In July 2006, Local 970 mailed Behr an early retirement withdrawal card indicating he was a retired member in good standing.  When Behr asked Connolly why he received it, she said he had retired.  He denied this and said he would send his July union dues but Connolly said she would not accept them. On July 28, 2006, Behr mailed a check for his July and August dues, but Local 970 returned the check.

On September 21, 2006, Behr faxed a note to Keegel, Fortier, Truchinski, and the Board stating he had not "Retired, Quit, or Resigned."  In early 2007, Behr received a severance check for $15,400, which Behr returned on February 4, 2007, with a note stating that he had not retired.

Behr has not worked for Local 970 since June 2, 2006.

### c.      Termination of Behr's Union Membership

Under the IBT constitution and the Local 970 bylaws, active employment in a union trade or by the union itself is a prerequisite to membership and to holding office in Local 970.  Members can retain active membership for six months after termination from qualifying employment as long as they continue

to pay their dues.  Members who retire from qualifying employment are given honorable withdrawal cards upon retirement.

### B.    Procedural Background

On September 5, 2006, Behr filed a Complaint against Defendants alleging violations of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 et seq. ("LMRDA"): Count One, violation of 29 U.S.C. § 411(a)(5), and Count Two, violation of 29 U.S.C. § 431(c).  Count One is based on he allegation that Defendants violated his right to free speech by removing him from his elected union position as Vice-President of Local 970 and terminating his union membership.  Count Two is based on Behr's allegation that Defendants denied him access to financial information, such as the cost of leased vehicles used by the officers of Local 970.

On January 5, 2007, Defendants brought a motion to dismiss the Complaint based on failure to state a claim and failure to exhaust administrative remedies. [Docket No. 10]  On March 28, 2007, the Court denied the motion to dismiss. [Docket No. 23]

Defendants now bring this motion for summary judgment.

### III.   DISCUSSION

### A.    Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.    Count One, Violation of 29 U.S.C. § 411(a)(5)

#### 1.    Standard

The statute provides:

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5).  Behr asserts that his refusal to support the Hoffa-Keegel campaign and his questioning regarding Local 970 finances were protected free speech under 29 U.S.C. § 411(a)(2).  Behr claims that Defendants took improper

14

disciplinary action against him in retaliation for that protected speech.  The

statute provides:

> Every member of any labor organization shall have the right to meet
> and assemble freely with other members; and to express any views,
> arguments, or opinions; and to express at meetings of the labor
> organization his views, upon candidates in an election of the labor
> organization or upon any business properly before the meeting,
> subject to the organization's established and reasonable rules
> pertaining to the conduct of meetings . . .

29 U.S.C. § 411(a)(2).

In order to establish his claim, Behr must present facts showing that "(1) he

. . . exercised the right to oppose union policies; (2) he . . . was subjected to

retaliatory action; and (3) the retaliatory action was a direct result of his . . .

decision to express disagreement with the union's leadership."  Casumpang v.

Int'l Longshoremen's & Warehousemen's Union, Local 142, 269 F.3d 1042, 1058

(9th Cir. 2001) (citing Sheet Metal Workers' Int'l Ass'n v. Lynn, 488 U.S. 347, 354

(1989)).  See also Black v. Ryder/P.I.E. Nationwide, Inc., 970 F.2d 1461, 1469 (6th

Cir. 1992) ("Plaintiff must prove each of the following propositions.  Number

one, that his conduct was an exercise of free speech as defined and protected by

the [LMRDA].  Number two, that he must prove that defendant took actions

against him in substantial part because of this exercise of his rights under the

15

[LMRDA].  Number three, he must prove that he was damaged and suffered an injury, as a proximate result of the actions of the defendant.").

### 2.    Whether Behr Engaged in Protected Speech

The Court concludes that Behr has set forth sufficient evidence to survive a motion for summary judgment regarding whether he engaged in protected speech.  First, Behr's initial refusal to support the Hoffa/Keegel reelection campaign is the type of speech specifically protected by § 411(a)(2) (noting member's right to express "his views, upon candidates in an election of the labor organization").  The Court rejects Defendants' argument that, because Behr acknowledged that he had no objection to Hoffa and Keegel being re-elected, he agreed with Defendants.  Behr refused to donate to the campaign numerous time, voiced his criticism of the candidates, and finally donated to the campaign based his fear of losing his job.  The Court concludes that there is a genuine issue of material fact regarding whether Behr engaged in protected activity when he failed to support the Hoffa/Keegel ticket.  Criticism of a union ticket – and failure to support it – qualifies as protected political speech.

The Court also concludes that Behr's enquiries into and criticisms of Local 970's finances and his criticisms of Fortier's spending habits could also be found

to be protected speech.  See <u>Gilvin v. Fire</u>, 259 F.3d 749, 758-59 (D.C. Cir. 2001)

("Finally, there was nothing about the substance of Gilvin's criticism that was

inconsistent with his duties as a union official.  To the contrary, Gilvin's letters

challenged the financial policy of the President and Executive Board, a topic well

within the rights of any union member and certainly of the Secretary-Treasurer,

whose responsibilities include perform[ing] all such duties as may be deemed

necessary to a proper and effective administration of the financial affairs of the

Union.") (citations omitted).  Defendants' arguments that Behr's statements

regarding finances were not protected because they constituted personal attacks

on Fortier or were part of similarly-minded discussions are disputed by Behr and

will be determined by the fact-finder at trial.  The fact that his criticisms may

have been based on trustee complaints does not take his speech outside the realm

of protection.  Whether Behr's complaints about credit card expenses stemmed

from a mistaken belief regarding Local 970's credit card policy is a disputed fact

issue that the Court cannot resolve on summary judgment.

### 3.      Whether Behr Was Disciplined or Expelled Without Statutory Safeguards

Behr claims that it is undisputed that Defendants treated his Vice

Presidency and union membership as terminated without serving him with

specific charges, giving him a reasonable time to prepare a defense, or affording

him a full and fair hearing.  Defendants assert that they merely sought to fire

Behr from his job a Business Agent, a position not protected by the statute.  They

claim that Behr voluntarily retired from his position as Vice-President and from

the union.  Behr claims he was involuntarily terminated.

There is conflicting evidence regarding what occurred at the June 2, 2006

meeting.  Although there is evidence that Behr did not voluntarily retire,

Defendants announced his retirement, refused to allow him to continue as Vice-

President, provided him with an early retirement withdrawal card, and returned

his proffered payment of union dues.  Behr attempted to return to work and pay

his union dues, denied that he was retired in conversations and in faxed

messages to Keegel and to Defendants, and returned the first installment of the

proposed severance payment.  There is sufficient evidence to support Behr's

theory that he did not retire.

The Court concludes that hat there is a genuine issue of material fact

regarding whether Behr retired or was fired.  If he was fired, then he meets the

element of termination or discipline in violation of the statute's procedures.

18

### 4.     Causation

Defendants argue that the dispute over whether Behr accepted or rejected a retirement offer from Local 970 does not preclude summary judgment because Behr cannot show a causal link between his claimed protected acts and the alleged retaliation.

The Court concludes that there is a genuine issue of material fact regarding causation and Behr's speech regarding the election.  Behr and Defendants had been involved in an ongoing dispute regarding the Hoffa campaign.  For example, Behr has presented evidence that, at one point, Fortier forced him off of the Jurisdiction Committee based on his failure to support the Hoffa/Keegel campaign.  Fortier testified that his reasons for terminating Behr included Behr's opposition to Local 970's election procedures for the IBT Convention of Delegates, which itself arose out of Behr's initial failure to support the Hoffa/Keegel campaign.  According to Behr, Truchinski told him to come to the June 2 meeting based on assurances that the meeting would address the bylaws and the leased vehicles issue.

The Court also concludes that there is a genuine issue of material fact regarding causation and Behr's financial speech.  Like the campaign issue, the

financial issue was an ongoing power struggle between the parties.  As noted,

Behr claims that Truchinski told Behr to attend the June 2 meeting by promising

that the leased vehicles issue would be addressed.  Truchinski testified that, even

at the June 2 meeting, the parties argued about the credit card charges.

     5.       **Conclusion**

Based on the existence of genuine issues of material fact, the Court

concludes that summary judgment on Count One is inappropriate.

**C.      Count Two, Violation of 29 U.S.C. § 431(c)**

     1.       **Introduction**

In Count Two, Behr alleges that Defendants have intentionally withheld

union financial information from him, despite his repeated requests.  Under 29

U.S.C. § 431(b), "[e]very labor organization shall file annually with the Secretary

a financial report" containing specified information, commonly known as an LM-

2.  Additionally, the statute provides:

> Every labor organization required to submit a report under this
> subchapter shall make available the information required to be
> contained in such report to all of its members, and every such labor
> organization and its officers shall be under a duty enforceable at the
> suit of any member of such organization . . .  in the district court of
> the United States for the district in which such labor organization
> maintains its principal office, to permit such member for just cause

to examine any books, records, and accounts necessary to verify such report.  The court in such action may, in its discretion, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

29 U.S.C. § 431(c).

The only remedy permitted under § 431(c) is an order requiring disclosure of the records supporting a mandatory disclosure and the award of attorney fees and costs.  29 U.S.C. § 431(c); <u>Sinito v. U.S. Dept. of Justice</u>, 176 F.3d 512, 514 (D.C. Cir. 1999); <u>Brown v. Local 701 of Int'l Bhd. of Elec. Workers</u>, 996 F. Supp. 781, 790 (N.D. Ill. 1998).

In order to obtain this remedy in a preliminary injunction, summary judgment order, or at trial, Behr must produce some "objective evidence of impropriety."  <u>Spinowitz v. Herrity</u>, 672 F. Supp. 670, 673 (E.D.N.Y. 1987).  He must also demonstrate "just cause" in order to obtain for an order seeking inspection of financial records.  29 U.S.C. § 431(c); <u>Kinslow v. Am. Postal Workers Union, Chicago Local</u>, 222 F.3d 269, 273 (7th Cir. 2000).

### 2 .   Whether Behr Had Access to the Records in Question

Here, Behr seeks to review the records relating to the costs of the Local 970's officers' vehicles which, he claims, underlie the filed LM-2's.  He asserts

21

that he requested this summary from Connolly and that his request was refused,

except with respect to Behr's own vehicle.  Behr argues that although he did have

access to the records of paid expenses, the summaries of the costs of leasing the

officers' vehicles were not filed with other records to which Behr and the other

officers had access.  Rather, according to Connolly, they were separately allocated

in a different report inside of QuickBooks, to which only Connolly had access.

The Court may order inspection of the records only if they are not made

available.  29 U.S.C. § 431(c).  Connolly's uncontradicted deposition testimony

demonstrates that the items on her computer spreadsheet simply summarized

the information that was available to the Board and stored in the file cabinet to

which Behr admits he had regular access.  Connolly did not add information or

change information to put it into her system; she merely assembled it.  As a

Board member, Behr regularly reviewed all of the relevant receipts and checks.

Behr admits that he could have reviewed the checks and ledgers available to him

to determine Fortier's lease expenses, but he chose not to.  Thus, Behr never

lacked access to the information underlying Local 970's annual financial report.

Behr has not provided evidence that the records he sought were

unavailable to him.  On this basis alone, Defendants are entitled to summary

judgment on Count Two.

### 3.      Whether Behr Can Show Just Cause for His Request

Behr has not advanced any facts supporting "just cause" for his request for financial records and he has never tied his request to any desire to verify Local 970's LM-2, which is the stated purpose of the cause of action.

A demand for information under § 431 must relate in some way to the LM-2 report required by the statute. <u>See</u> <u>Kinslow</u>, 222 F.3d at 274 ("The just cause requirement simply entails a showing that the union member had some reasonable basis to question the accuracy of the LM-2 or the documents on which it was based, or that information in the LM-2 has inspired reasonable questions about the way union funds were handled.") (citation omitted). <u>See also</u> <u>Mallick v. Int'l Broth. of Elec. Workers</u>, 749 F.2d 771, 783 (D.C. Cir. 1984) ("[P]olitical opposition to union officials, unaccompanied by any specific concern with transactions summarized on the LM-2 report, does not constitute just cause for rummaging through all the union records.") (footnote omitted); <u>Flaherty v. Warehousemen, Garage & Serv. Station Employees' Local Union No. 334</u>, 574 F.2d 484, 486 (9th Cir. 1978) ("As stated earlier, the appellant's reasons for examining the records were not related to the union's LM-2 reports.  Therefore,

Judge Neill properly granted summary judgment for the appellees.") (footnote omitted); Krokosky v. United Staff Union, 291 F. Supp. 2d 835, 843 (W.D. Wis. 2003) ("The statute's structure indicates that just cause ought to relate to the LM-2.  Document disclosure pursuant to § 431(c) is a supplement to the reporting requirements defined in subsections (a) and (b).  Congress could have made this disclosure provision an independent section of the act, but made it an appendage instead.").  As the Krokosky court reasoned, "In any event, the argument that just cause is established whenever a union official refuses to provide members with any and all information on request must fail because it is based on circular reasoning that would effectively eliminate the just cause limitation."  Krokosky, 291 F . Supp. 2d at 843.

There is no evidence in the records that Behr ever sought any financial records from Local 970 because he had questions about Local 970's LM-2s.  Behr has not identified the "just cause" relating to Local 970's LM-2 report which necessitates an order compelling inspection.

### 4.      Conclusion

The Court grants Defendants' motion for summary judgment on this claim because Behr had access to all information to which he was entitled under the

statute.  Moreover, Behr cannot show just cause for seeking the information

regarding the vehicle leases because he has presented no evidence that his

request was in any way tied to the LM-2 reports.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

Defendants' Motion for Summary Judgment [Docket No. 26] is **GRANTED
IN PART** and **DENIED IN PART** as follows:

1.      Count One **REMAINS**; and

2.      Count Two is **DISMISSED**.


Dated:  June 1, 2008                                s / Michael J. Davis
                                                    Judge Michael J. Davis
                                                    United States District Court